IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**SOUND ENERGY**
**COMPANY, INC.**, *et al.*,

        **Plaintiffs,**

    v.                                     Civil Action 2:18-cv-1771
                                          Magistrate Judge Elizabeth P. Deavers

**ASCENT RESOURCES –**
**UTICA, LLC**, *et al.*,

        **Defendants.**

## OPINION AND ORDER

With the consent of the parties and by Order of Reference (ECF No. 10), pursuant to 28 U.S.C. § 636(c), this matter is before the Court for consideration of Plaintiffs' Supplemental Motion for Partial Summary Judgment on Count Two of Plaintiffs' First Amended Complaint, ECF No. 79 ("Plaintiffs' Motion"), Defendant Ascent Resources – Utica, LLC's Motion for Summary Judgment, ECF No. 80 ("Ascent's Motion"),[1] and Plaintiffs' Motion for Leave to File Supplemental Authority *Instanter* Relating to Pending Motions for Summary Judgment, ECF No. 85 (the "Motion to File Supplemental Authority"). Each Motion has been fully briefed and is ripe for review. (*See* ECF Nos. 79-85.) For the following reasons, Plaintiffs' Motion (ECF No. 79) is **DENIED**, Ascent's Motion (ECF No. 80) is **DENIED**, and the Motion to File Supplemental Authority (ECF No. 85) is **GRANTED**.

---

[1] Defendant Ascent Resources – Utica, LLC ("Ascent") requested oral argument in the caption of Ascent's Motion. (*Id.*) Pursuant to S.D. Ohio Civ. R. 7.1(b)(2), the Court will hold oral arguments if "it is deemed to be essential to the fair resolution of the case because of its public importance or the complexity of the factual or legal issues presented." *Id.* Ascent did not expand on its request, and accordingly has not demonstrated that this matter rises to a level of complexity necessary to justify oral argument. Moreover, the Court finds that oral argument is not essential to the fair resolution of this matter. Accordingly, Ascent's request is **DENIED**.

## I.  BACKGROUND

This is the second round of summary judgment briefing in this action.  Previously, the parties filed competing motions for summary judgment on all seven causes of action in the operative First Amended Complaint.  (*See* ECF Nos. 41-44, 67-70, 73-75.)  On March 23, 2021, the Court granted summary judgment to Defendant Carrizo (Utica) LLC on all of Plaintiffs' claims against it, and granted summary judgment to Ascent on Counts Four (Slander of Title), Five (Tortious Interference), and Seven (Unjust Enrichment).  (ECF No. 77 (the "First Summary Judgment Order").)  The Court found, however, that the parties had not provided enough information for the Court to analyze Plaintiffs' claims against Ascent in Count One (Quiet Title) or Count Two (Breach of Contract), and denied Plaintiffs' and Ascent's motions without prejudice to re-filing on those issues.  (*Id.*)  The Court ordered as follows:

> Accordingly, both Plaintiffs' Motion and Ascent's Motion are **DENIED WITHOUT PREJUDICE** as to re-filing a motion which cures the defects identified herein with regard to Count Two of Plaintiffs' First Amended Complaint. Should either party choose to re-file a motion for summary judgment as to Count Two, such motion shall be filed on or before **APRIL 23, 2021**, and the briefing shall confirm which of the Sound Energy Leases are relevant to the Londonderry Wells; which of the Sound Energy Leases are relevant to the Carrizo Leases; which of the Sound Energy Leases are relevant to the Ascent Leases; which of the Sound Energy Leases are relevant to the Hoop Unit; which other parcels are at issue, if any, and to which Sound Energy Leases such parcels are subject; and which of the Sound Energy Leases are otherwise relevant to Plaintiffs' breach of contract claim against Ascent.

(*Id.* at PAGEID ## 4633-4634 (bold emphasis in original; footnote omitted).)  The Court noted that "any subsequently filed Motion should analyze both of Plaintiffs' remaining claims."  (*Id.* at PAGEID # 4634, n.15.

On April 23, 2021, the parties filed the subject Motions.  (ECF Nos. 79, 80.)  On May 14, 2021, Plaintiffs filed a response in opposition to Ascent's Motion, and on May 17, 2021, Ascent filed a response in opposition to Plaintiffs' Motion.  (ECF Nos. 81, 82.)  On May 28, 2021,

Ascent filed a reply brief, and on June 1, 2021, Plaintiffs filed a reply brief. (ECF Nos. 83, 84.) Then, on October 28, 2021, Plaintiffs filed Plaintiffs' Motion for Leave to File Supplemental Authority *Instanter* Relating to Pending Motions for Summary Judgment, alerting the Court to *Browne v. Artex Oil Co.*, 5th Dist. Guernsey No. 21CA000002, 2021-Ohio-2239, *appeal not allowed*, 164 Ohio St.3d 1461, 2021-Ohio-3594. (ECF No. 85.)[2]

The subject Motions are thus ripe for judicial review. As a preliminary matter, the Court incorporates by reference the discussion of the relevant background as set forth in the First Summary Judgment Order.[3] (*See* ECF No. 77 at PAGEID ## 4344-4351.) The Court will not rehash these facts here, and will instead focus on the relevant information and arguments provided by the parties in the second round of summary judgment briefing.

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden of proving that no genuine issue of material fact exists falls on the moving party, "and the court must draw all reasonable inferences in the light most favorable to the nonmoving party." *Stransberry v. Air Wisconsin Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (citing *Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 710 (6th Cir. 2001); *cf.* Fed. R. Civ. P. 56(e)(2) (providing that if a

---

[2] Plaintiffs indicated that they sought Defendant's consent to filing the *Browne* case as supplemental authority, but "Defendant's counsel [had] not responded to that request." (ECF No. 85.) The Court notes that Defendant did not file a response in opposition to Plaintiffs' request. Accordingly, Plaintiffs' Motion for Leave to File Supplemental Authority *Instanter* Relating to Pending Motions for Summary Judgment, ECF No. 85, is **GRANTED**.

[3] This includes references to the relevant leases, which are defined throughout the Court's prior order. (*See* ECF No. 77 at PAGEID ## 4345-4346.) The Court incorporates these names by reference and will refer to the relevant leases by these names throughout this Opinion and Order.

party "fails to properly address another party's assertion of fact" then the Court may "consider the fact undisputed for purposes of the motion").

"Once the moving party meets its initial burden, the nonmovant must 'designate specific facts showing that there is a genuine issue for trial.'" *Kimble v. Wasylyshyn*, 439 F. App'x 492, 495-496 (6th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)); *see also* Fed. R. Civ. P. 56(c) (requiring a party maintaining that a fact is genuinely disputed to "cit[e] to particular parts of materials in the record"). "The nonmovant must, however 'do more than simply show that there is some metaphysical doubt as to the material facts,'. . . there must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a 'genuine' dispute." *Lee v. Metro. Gov't of Nashville & Davidson Cty.*, 432 F. App'x 435, 441 (6th Cir. 2011) (citations omitted).

In considering the factual allegations and evidence presented in a motion for summary judgment, the Court "must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (internal citation omitted). "When a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case, summary judgment is appropriate." *Stransberry*, 651 F.3d at 486 (citing *Celotex*, 477 U.S. at 322–23)

### III. ANALYSIS

Only two causes of action remain in dispute in this case: Count One (Quiet Title) and Count Two (Breach of Contract). With the benefit of the parties' additional briefing, the Court now appreciates that "[t]he only parcels at issue within Plaintiffs' breach of contract claim against Ascent are those contained within the Hoop Unit" and "[a]ll other parcels covered by the

4

Sound Energy Leases are at issue within Plaintiffs' quiet title claim." (ECF No. 79-1 at PAGEID # 4396.) But as the Court observed in the First Summary Judgment Order, "[i]f Ascent's expiration theory is correct . . . then Plaintiffs cannot prevail on Count One or Count Two against Ascent, as Plaintiffs' ORRI will have expired," and "[o]n the other hand, if Ascent's expiration theory is incorrect, then Plaintiffs may prevail on these claims." (ECF No. 77 at PAGEID # 4383.) The parties have confirmed this summary in their briefing. (ECF No. 80 at PAGEID # 4724 ("Plaintiffs' remaining claims . . . are both premised upon the continued validity of the Sound Energy Leases[.]").) Accordingly, the Court begins its analysis by reviewing Ascent's threshold argument that the Sound Energy Leases have expired.

As Ascent explains in the second round of summary judgment briefing, there are five leases at issue that cover the subject wells:[4] the McElhaney Lease, the Bond Lease, the Angle Lease, the Merryman Lease, and the Downerd Lease. Of these leases, the McElhaney Lease includes a habendum clause that keeps the lease in effect so long as "oil, gas, or their constituents are produced in paying quantities thereon . . . ." (ECF No. 59-1 at PAGEID # 4360.) The other leases contain habendum clauses with similar language, but *also* contain a clause that keep the respective leases in effect so long as "the premises shall be operated . . . in the search

---

[4] As discussed in the First Summary Judgment Order, the subject wells are the Dorst #1 Well, the Camp Estates #1 Well, the Estep #1 Well, and the Downerd #1 Well (collectively, the "Londonderry Wells'). (ECF No. 77 at PAGEID # 4350.) Plaintiff submits that a fifth well – the McClelland No. 2 Well – also is a Londonderry Well, held by the Murray Lease, but argues that "Ascent has raised no issue in this lawsuit" as to the Murray Lease, so "therefore [the Murray Lease] is not in dispute." (ECF No. 79-1 at PAGEID # 4394.) In response, Ascent argues for the first time that "[t]he McClelland No. 2 Well ceased producing in paying quantities on or before May 2014," so the Murray Lease has long expired. (ECF No. 82 at PAGEID ## 5378-5380.) To the extent Ascent argues that the Murray Lease is at issue in this litigation, the Court finds such argument to be untimely and inconsistent not only with the first round of summary judgment briefing but also with Ascent's Motion, *see* ECF No. 80 at PAGEID ## 4717-4718. Accordingly, the Court will only analyze the four Londonderry Wells discussed above.

for oil and gas" or "operations are maintained" on the subject land. (*See* ECF No. 77 at PAGEID # 4361.) Ascent argues that the "operations" required to satisfy such language "are affirmative efforts to produce oil and gas in paying quantities (i.e. drilling operations)—not simply well maintenance." (ECF No. 80 at PAGEID # 4725.) Ascent further submits that while such "operations" can "hold the lease in lieu of production in paying quantities, it means a good-faith, reasonable effort to obtain production in paying quantities." (*Id.* at PAGEID # 4726.) But Ascent argues that "Plaintiffs have never done this." (*Id.*) Thus, Ascent's expiration theory boils down to two issues: first, whether the wells covered by the subject leases have ceased producing in paying quantities, and second, if they have, whether Plaintiffs have maintained sufficient "operations" on the wells covered by the Bond Lease, the Angle Lease, the Merryman Lease, and the Downerd Lease. But because Plaintiffs have tied their "operations" argument to their "paying quantities" argument (such that there were no "operations" because there were no "effort[s] to obtain production in paying quantities"), the Court need only address the latter at the outset. (ECF No. 80 at PAGEID ## 4725-4728.)

As a preliminary matter, the Court must unpack the state of Ohio law regarding "paying quantities." The Supreme Court of Ohio has defined the term "paying quantities" as the production of "quantities of oil or gas sufficient to yield a profit, even small, to the lessee over operating expenses, even though the drilling costs, or equipping costs, are not recovered, and even though the undertaking as a whole may thus result in a loss." *Blausey v. Stein*, 61 Ohio St.2d 264, 265-266 (1980). "[T]he Court essentially defers to lessee's judgment by allowing the lessee to continue even though the operation as a whole does not profit as long as the income minus current operating expenses makes a profit." *Paulus v. Beck Energy Corp.*, 7th Dist. No. 16 MO 0008, 2017-Ohio-5716, ¶ 77. As for what constitutes a profit, Ohio courts have held that

6

"the lessee has discretion to determine whether a well is profitable." *Burkhart Family Tr. v. Antero Resources Corp.*, 68 N.E.3d 142, 2016-Ohio-4817, ¶ 18 (collecting cases).  This determination cannot be arbitrary, however, and "courts impose a good faith standard on the lessee." *Id.*  Accordingly, "when bona fide, [a lessee's judgment] is entitled to great weight in determining whether the gas is in fact produced in paying quantities." *Id.* (quotation marks and citations omitted).

Against that background, the parties dispute whether the Londonderry Wells are producing in paying quantities.  In support of their position, Ascent relies on the opinion and declarations of their expert Daniel T. Reineke, P.E., a Professional Engineer licensed through the State of Oklahoma and the State of Utah, who possesses over 44 years of oil and gas operational experience in various regions of the United States.  (*See* ECF No. 49-1 (expert report); ECF No. 62-1 at PAGEID ## 4076-4077 (first declaration); ECF No. 74-2 at PAGEID ## 4307-4308 (second declaration).)  The Court must note, however, the history of Mr. Reineke's varying positions on this issue.  First, on December 2, 2019, Mr. Reineke opined that the Londonderry Wells ceased producing in paying quantities as follows:

| Well | Last Month Well Produced in Paying Quantities | Total Net Revenue for 5-Year Period Prior to January 2018 |
| --- | --- | --- |
| Dorst #1 | October 2012 | -$6,256.02 |
| Camp Estates #1 | May 2014 | -$2,231.70 |
| Estep #1 | September 2017 | -$3,757.24 |
| Downerd #1 | October 2017 | -$40,749.87 |

(ECF No. 49-1 at PAGEID # 2056.)  Then, on April 6, 2020, Mr. Reineke adjusted his calculations and opined as follows:

7

| Well | Last Month Well Produced in Paying Quantities | Total Net Revenue for 5-Year Period Prior to January 2018 |
|---|---|---|
| Dorst #1 | October 2012 | -$5,501.23 |
| Camp Estates #1 | May 2014 | -$2,982.05 |
| Estep #1 | September 2017 | -$1,435.43 |
| Downerd #1 | October 2017 | -$39,031.50 |

(ECF No. 62-1 at PAGEID # 4077.)  Most recently, on May 18, 2020, Mr. Reineke adjusted his calculations and opined as follows:

| Well | Last Month Well Produced in Paying Quantities | Total Net Revenue for 5-Year Period Prior to January 2018 |
|---|---|---|
| Dorst #1 | October 2012 | -$3,244.73 |
| Camp Estates #1 | May 2014 | -$2,257.05 |
| Estep #1 | September 2017 | -$1,168.76 |
| Downerd #1 | October 2017 | -$586.70 |

(ECF No. 74-2 at PAGEID # 4308.)  Thus, while Mr. Reineke's ultimate opinion (i.e., that the Londonderry Wells ceased producing in paying quantities) has never wavered, the calculations supporting that opinion appear to be getting incrementally closer over time to undermining Mr. Reineke's opinion and disproving Ascent's primary argument.

On the other hand, Plaintiffs primarily rely on their own determination that the Londonderry Wells were profitable.  Specifically, Plaintiff Levengood – who is the co-owner and President of Plaintiff Sound Energy Company, Inc. – has submitted a declaration to this end. (*See* ECF No. 69-5 at PAGEID # 4251, ¶ 6 ("As shown in the Accounting and after factoring in the royalty payments, which I have reviewed, the [Londonderry] Wells have been overall profitable to the working interest owners of the [Londonderry] Wells and associated oil and gas

8

leases.").) Plaintiff Levengood's calculations supporting this conclusion are summarized as follows:

| Well | Profit from January 2011 to September 2019 |
|---|---|
| Dorst #1 | $8,243.33 |
| Camp Estates #1 | $3,401.27 |
| Estep #1 | $9,482.22 |
| Downerd #1 | $3,810.40 |

(ECF No. 69-5 at PAGEID # 4251.) Plaintiff Levengood states that these profit calculations do not account for "non-recurring and capital expenditures for the Wells and factor[] in the lessors' 12.5% lease royalties on the gross revenue. (*Id.*) Accordingly, Plaintiffs argue that their good-faith determination is consistent with Ohio law. (ECF No. 81 at PAGEID ## 5344-5351.)

Not surprisingly, the parties disagree not only on whether the Londonderry Wells ceased producing in paying quantities, but also on how to reach that conclusion. To this end, the largest dispute stems from the parties' competing arguments about whether the "paying quantities" calculation should account for Plaintiff Baker's maintenance of the Londonderry Wells as an operating expense. On one hand, Ascent believes that the calculation must account for Plaintiff Baker's labor because "a corporate operator cannot artificially deflate operating costs to reach a profit." (ECF No. 44 at PAGEID # 1307.) Relying on Plaintiff Baker's own deposition testimony regarding the rate that he and other independent well pumpers charged for well pumping services, Ascent quantifies the value of Plaintiff Baker's labor at $75/month. (ECF No. 83 at PAGEID # 5484 (citing ECF No. 59-1 at PAGEID ## 3460-3461).) In response, Plaintiffs insist that "under Ohio law a lessee who receives free labor on its wells need not count the value of that labor as an operating expense." (ECF No. 81 at PAGEID # 5348.) Accordingly, each of

Mr. Reineke's "paying quantities" calculations (on which Asent relies) include Plaintiff Baker's maintenance labor as an operating expense valued at $75/month, while Plaintiff Levengood's "paying quantities" calculations do not account for Plaintiff Baker's labor as an operating expense at all.[5]

The Court agrees with Plaintiffs that Plaintiff Baker's free labor is not an operating expense for purposes of the "paying quantities" analysis. The Court concludes that to hold otherwise would be directly at odds with the Supreme Court of Ohio's holding that "[t]he fact that a lessee can keep operating costs at a minimum should inure to his benefit in a determination of whether a well produces in paying quantities." *Blausey*, 61 Ohio St.2d at 266 (internal citation omitted). Indeed, as Plaintiffs correctly observe, Ohio courts routinely decline to include a market rate where lessees have received the benefit of free labor. *See Burkhart Fam. Tr.*, 2016-Ohio-4817, at ¶ 27 ("Mr. Sulsberger testified that he has no employees, thus has no payroll expenses. Instead of hiring employees, Mr. Sulsberger relied on the Burkharts and G–R employees to tend to the well. Mrs. Burkhart and Cyrus A. Burkhart supported these statements when they testified that **Mr. Burkhart pumped the well at no charge and his son, Cyrus A. Burkhart, continued this practice**. Mr. Sulsberger testified that **a G–R employee who lived near the Burkhart property routinely checked on and maintained the well at no cost**.") (emphasis added); *Blausey*, 61 Ohio St.2d at paragraph one of the syllabus ("In determining whether an oil or gas well is producing in paying quantities for purposes of carrying out the provisions of an oil or gas lease, **it is not necessary to include the value of an individual**

---

[5] Interestingly, neither party discloses what their "paying quantities" calculations would look like if they were wrong about how to account for Plaintiff Baker's labor. Put differently, Plaintiffs do not reveal what their analysis would look like if Plaintiff Baker's labor *was* an operating expense, and Ascent does not state what their analysis would look like if Plaintiff Baker's labor was *not* an operating expense.

10

**lessee's own labor** as an operating expense.") (emphasis added). And unlike in *Talbott v. Condevco, Inc.*, 2020-Ohio-3130, 155 N.E.3d 84 (7th Dist.), on which Ascent relies, Mr. Baker is not "an employee [hired] to perform tasks related to recurring well production activities." *Id.* Rather, Mr. Baker is a lessee providing his own labor, for free, which aligns this case with *Blausey*.

While the exact fact pattern before the Court may be unique, that is where only one of multiple lessees is the one providing the free labor, the Court does not share Ascent's concern that *Blausey* "must be construed narrowly (i.e., confined to its facts) in order to avoid chicanery." (ECF No. 80 at PAGEID # 4729.) Ascent is concerned about a slippery slope, and hypothesizes that under Plaintiffs' (and the Court's) reading of *Blausey* and its progeny, "one hundred entities could invest in a well and shift all operating expenses to a single investor who would agree to take a loss on the well in exchange for profit on other wells — or the promise of future payment from unconventional, vastly more expensive and labor intensive, well production by another operator." (*Id.* at PAGEID ## 4728-4729.) The calculus before the Court, however, does not provide discretion for evaluating motives. The Court, therefore, declines to entertain Ascent's hypotheticals. *Lang v. Weiss Drilling Co.*, 70 N.E.3d 625, 2016-Ohio-8213, ¶ 54 (7th Dist.) ("Weiss's financial motive for attempting to maintain the Lease is irrelevant to the issue in this case, which is whether the Lease ended by its terms for lack of production in paying quantities. Clearly, all of the parties involved in this litigation have a financial motive."); *Burkhart Fam. Tr.*, 2016-Ohio-4817, ¶ 29 ("[W]hether or not Tri–County would profit from G–R's deep drilling activities has no bearing at all on the [paying quantities] determination."); *see also Talbott*, 2020-Ohio-3130, at ¶ 38 (describing the "paying quantities" analysis as "a mathematical formula")

(citing *Blausey*).  Rather, this Court finds that Plaintiffs' collective ability[6] to keep operating costs at a minimum should inure to their benefit, no matter the motive.  *Blausey*, 61 Ohio St.2d at 266.

Accordingly, the Court finds that Mr. Reineke's opinions are not supportable under Ohio law, as he only reached those opinions by improperly accounting for Mr. Baker's labor as an operating expense.  (ECF No. 83 at PAGEID # 5484.)  Ascent has therefore failed to meet its initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact.  Moreover, the Court remains ill-equipped to resolve Ascent's expiration argument.  *Celotex Corp.*, 477 U.S. at 323.  This does not mean, however, that the Court necessarily agrees with Plaintiffs that the Londonderry Wells have been producing in paying quantities.  Rather, the Court finds that a genuine issue of material fact exists on this issue.  On one hand, as discussed above, the Court recognizes Plaintiff Levengood's Declaration that "the Wells have been overall profitable to the working interest owners of the Wells and associated oil and gas leases."  (ECF No. 69-5 at PAGEID # 4251.)  The Court is also mindful of the great weight that it should afford to Plaintiffs' position, as Ohio courts "have determined that the lessee has discretion to determine whether a well is profitable."  *Burkhart Fam. Tr.*, 2016-Ohio-4817, at ¶ 18.  But the Court cannot accept Plaintiff Levengood's Declaration of profitability as a matter of law, because doing so would necessarily turn a blind eye to some of Plaintiffs' other deposition testimony to the contrary.

---

[6] At the end of Ascent's Motion, Ascent alternatively argues that "[a]t best, only Mr. Baker's pro rata share of the fair market value of tending the [wells] can avoid the expense of his labor," and that "[t]he remaining Plaintiff-investors must account for [Mr. Baker's] labor as a well expense as to their interests."  (ECF No. 80 at PAGEID # 4729.)  Ascent conspicuously provides no authority for this suggestion, and the Court is unclear whether Ascent abandoned the argument by not addressing it in subsequent briefing.  Regardless, it is not well taken, as the Court finds it at odds with the other case law discussed herein.

To this end, Ascent correctly points to deposition testimony that arguably undermines Plaintiffs' position that the Londonderry Wells are profitable.  For example, Plaintiff DeMattio testified about how *unprofitable* the Londonderry Wells were:

> Like Chuck and I are good businessmen, like we're not, because we'll do things for nothing. **You know, for instance the Londonderry wells, we do it for nothing, but we make money on other wells**. And so we pull that, you know, hopefully some days in Londonderry, we'll get it turned it around as the gas prices turn around hopefully some day. But, **you know, we make no money, per se, at Londonderry, but we still have a job to do and do it and just go on and bite the bullet**.

(ECF No. 52 at PAGEID # 2720 (emphasis added).)[7]  Plaintiffs argue that this "offhand" comment is "irrelevant," but the Court does not agree.  Plaintiff DeMattio's testimony is directly at odds with Plaintiff Levengood's declaration.  Yet, the Court is mindful that Ascent was not able to address that tension because Plaintiff Levengood had not made his declaration at the time Ascent deposed Plaintiff DeMattio.  (*Compare* ECF No. 69-5 (Plaintiff Levengood's Declaration, dated May 4, 2020) *with* ECF No. ECF No. 52 (Plaintiff DeMattio's deposition, taken November 11, 2019).)  The Court also notes that Plaintiffs' counsel did not attempt to clarify Plaintiff DeMattio's testimony on this critical issue during the deposition.  Under these circumstances, the Court is hesitant to accept Plaintiffs' *ex post facto* arguments at face value.  This is especially true given that Plaintiff Levengood did not "show his work" in his Declaration,

---

[7] While the present discussion is otherwise limited to the parties' "paying quantities" arguments, the Court notes that this testimony also creates a genuine issue of material fact with regard to the second part of Ascent's expiration theory (i.e., whether Plaintiffs maintained sufficient "operations").  Specifically, the Court finds that Plaintiff Baker's testimony that he decided to "bite the bullet" and "make no money" on the Londonderry Wells is directly at odds with Plaintiffs' argument that they "routinely worked to maintain the Londonderry Wells to achieve production." (*See* ECF No. 81 at PAGEID # 5355.)  The Court also agrees with Plaintiffs that the "operations" prong of Ascent's expiration theory is heavily fact-intensive and is not fit for summary judgment.  (*Id.* at PAGEID # 5351 ("One . . . must consider the totality of the lessee or lessees' actions" in "deciding whether there are sufficient operations to keep an oil and gas lease alive.").)  Accordingly, there remain several genuine issues of material fact regarding Ascent's expiration theory to preclude summary judgment.

as he instead merely referred to records without setting forth the actual calculations supporting his conclusion. (*Compare* ECF No. 69-5 *with* ECF No. 69-4.) Accordingly, the Court concludes that this is a genuine issue of material fact that must be resolved by a jury.

Finally, the Court must also address Plaintiffs' alternative argument, asserted only in passing in their Motion, that "the paying quantities analysis could not alter the Plaintiffs' ORRI'[s] continued validity because, at a minimum, the Carrizo Leases and Ascent Leases were 'replacements or substitutes' for their corresponding Sound Energy Leases." (ECF No. 79-1 at PAGEID # 4401; *see also* ECF No. 81 at PAGEID # 5342 ("even if Ascent could prove lease termination based on a lack of paying quantities, it cannot obtain summary judgment against Plaintiffs' claims because it has not proven the nonexistence of a replacement or substitute for the expired leases.").) Despite this appearing to be a potentially critical part of Plaintiffs' theory of liability, Plaintiffs did not substantively address the issue in the second round of briefing until their Reply brief. (*See* ECF No. 84 at PAGEID ## 5501-5505.)

Making matters worse, the Court finds that the parties still have failed to connect the Carrizo Leases and the Ascent Leases to their corresponding Sound Energy Leases in a meaningful way, notwithstanding the Court's prior directive to do so. (*See* ECF No. 77 at PAGEID ## 4386 (directing the parties to "confirm . . . which of the Sound Energy Leases are relevant to the Carrizo Leases [and] which of the Sound Energy Leases are relevant to the Ascent Leases").) While Plaintiffs purport to have supplied copies of the pertinent leases, nowhere in the second round of summary judgment briefing do the parties explain how any of the leases are related, or highlight the critical language in the relevant top leases to support their arguments.[8]

---

[8] The Court notes that in response to the First Summary Judgment Order, Plaintiffs simply attached 225 pages of exhibits for the subject Sound Energy Leases and their corresponding Carrizo Leases and/or Ascent Leases. (ECF No. 79-8, 79-9.) Many of these pages, however, are

Instead, the parties simply exchange interpretations of what "replacements or substitutes" means without citing to any legal authority.  While Plaintiffs acknowledge Ascent's "lack of legal support," they also conspicuously fail to provide their own legal support and instead rely on certain ordinary dictionary definitions.  (ECF No. 84 at PAGEID # 5504.)

The Court finds that Plaintiffs' cited evidence demonstrates that a genuine fact issue exists on this point.  Specifically, Plaintiffs cite deposition testimony from Ascent's corporate representative that a Carrizo Lease "replaced" the Downerd Lease (over multiple objections from Ascent's counsel).  (*Id.* at PAGEID # 5503 (citing ECF No. 40 at PAGEID ## 900-901).)  But Plaintiffs fail to discuss contradictory testimony from the same deposition in which Ascent testified that, notwithstanding any privileged discussions that involved an attorney, it did not conduct an "internal analysis" or have any "internal deliberations" regarding whether the Carrizo or Ascent Leases were "replacements or substitutes" for the Sound Energy Leases.  (ECF No. 40 at PAGEID ## 958-959.)  Ascent's representative also confirmed that Ascent's decision not to recognize Plaintiffs' ORRI was because it "believe[d] that [the Sound Energy Leases] had expired."  (*Id.* at PAGEID # 959.)

Plaintiffs also refer to evidence that they believe shows how Ascent communicated that certain top leases had "become the operative lease[s]."  (ECF No. 84 at PAGEID ## 5503.)  In presenting this evidence, Plaintiffs argue that Ascent "acknowledge[d] that the top leases are replacements for the original leases," but the Court disagrees with this characterization.  (*Id.*)  To the contrary, all Plaintiffs' evidence shows is that Ascent was operating under new leases, which

---

difficult (or impossible) to read, and Plaintiffs provided no guidance or direction for what they consider to be the critically relevant sections.  *Wise v. T-Man, LLC*, No. 1:14 CV 630, 2016 WL 3544715, at *9 (N.D. Ohio June 29, 2016) ("The Court will not parse through the record and attempt to support plaintiff's claim. Rather, it is incumbent on the plaintiff to point to the Court to evidence and law in support of her claim.").

is entirely consistent with Ascent's theory of the case (and its other deposition testimony).  The Court finds the communications from Ascent are not the smoking guns Plaintiffs present them to be.

As it stands, because the parties have again failed to flesh out the details of the subject leases, it is impossible for the Court to determine as a matter of law whether any leases "replace[d] or substitute[d]" the Sound Energy Leases.  *Nerswick v. CSX Transp., Inc.*, 692 F. Supp. 2d 866, 882 (S.D. Ohio 2010), *aff'd*, 441 F. App'x 320 (6th Cir. 2011) ("It is not the obligation of the court . . . to comb the record to find evidence or testimony establishing a party's case.") (citing *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir. 1989); *Baker v. Pfeifer,* 940 F.Supp. 1168, 1183 n. 20 (S.D. Ohio 1996) ("The Court is not required to comb through the record looking for [] evidence.") (citing *Street*)).  Plaintiffs have therefore failed to meet their initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact, and the Court remains ill-equipped to resolve Plaintiffs' "replacements or substitutes" argument.  *Celotex Corp.*, 477 U.S. at 323.

Accordingly, the Court finds that genuine issues of material fact exist as to Ascent's expiration theory and Plaintiffs' "replacements or substitutes" theory.

## V.  CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Leave to File Supplemental Authority *Instanter* Relating to Pending Motions for Summary Judgment (ECF No. 85) is **GRANTED**, Plaintiffs' Motion (ECF No. 79) is **DENIED**, Ascent's Motion (ECF No. 80) is **DENIED**.

**IT IS SO ORDERED.**

Date: March 29, 2022                   /s/ *Elizabeth A. Preston Deavers*
                                       ELIZABETH A. PRESTON DEAVERS
                                       UNITED STATES MAGISTRATE JUDGE